## STATE OF CONNECTICUT v. HUDEL CLIFTON GAMBLE
### (AC 29140)

Gruendel, Beach and Borden, Js.

Argued December 3, 2009—officially released February 9, 2010

*William B. Westcott*, special public defender, for the appellant (defendant).

*Timothy F. Costello*, deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Melissa Patterson*, deputy assistant state's attorney, for the appellee (state).

*Opinion*

BEACH, J. The defendant, Hudel Clifton Gamble, appeals from the judgment of conviction, following a jury trial, of manslaughter in the first degree with a firearm as an accessory in violation of General Statutes §§ 53a-55 (a) (3) and 53a-8.[1] The defendant claims that the court improperly (1) accepted the jury's verdict finding him guilty of manslaughter in the first degree with a firearm under the theory of accessorial liability and not guilty of the same crime under the theory of principal liability, thereby (a) violating his right against double jeopardy, (b) resulting in his being convicted of the nonexistent crime of being an "accessory," (c) resulting in a legally inconsistent verdict and (d) returning a verdict in violation of the principles of collateral estoppel, and (2) suggested in its jury instructions that defense counsel had made an improper closing argument, thereby improperly highlighting the defendant's decision not to testify. We affirm the judgment of the trial court.

---

[1] The defendant was also charged with and found not guilty of murder in violation of General Statutes §§ 53a-54a and 53a-8, conspiracy to commit murder in violation of General Statutes §§ 53a-54a and 53a-48 (a), possession of an assault weapon in violation of General Statutes §§ 53-202c and 53a-8, and conspiracy to possess an assault weapon in violation of §§ 53-202c and 53a-48 (e).

The following facts, which the jury reasonably could have found, and procedural history are relevant to the defendant's appeal. In November, 2005, Ricardo Ramos, who was fifteen years old, and the defendant, who was seventeen years old, were both residents of the "Hill" section of New Haven and had known each other for two or three years. On November 29, 2005, the defendant gave Ramos a loaded .22 caliber gun. Later in the day, Ramos and Daniel Smith, while riding in a BMW in the "Hill" section, picked up the defendant. Smith drove the vehicle, Ramos was seated in the front passenger seat and the defendant was seated in the backseat. They rode around in the vehicle while smoking marijuana.

At some point, Smith drove toward the "Tre" section of New Haven toward Kensington Street. While on Kensington Street, Ramos saw a woman with whom he was acquainted. Smith stopped the vehicle. The woman loudly informed Ramos that a person with whom Ramos had a "beef" was in the area. The three men drove around the block. As they drove down Kensington Street a second time, Ramos observed a person, who he believed had killed his cousin approximately one month earlier, walking on a sidewalk with a group of four or five other people. As Smith drove closer, the group on the sidewalk fired gunshots at the right side of the BMW. Ramos and Smith, who were both carrying weapons, returned fire through the open windows of the BMW. The defendant fired an SKS semiautomatic assault rifle, the barrel of which was resting on an open car window. The following morning, Ramos heard on the news that the victim, Marquis White, had been shot and killed on Kensington Street. Ramos realized that the victim was not the person who he believed had killed his cousin but, rather, was someone Ramos did not know.

Following a jury trial, the defendant was convicted of manslaughter in the first degree with a firearm as an accessory. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant challenges his conviction of manslaughter in the first degree with a firearm as an accessory on the ground that the jury's verdict (1) violated his right against double jeopardy, (2) resulted in his being convicted of the nonexistent crime of being an "accessory," (3) resulted in a legally inconsistent verdict and (4) violated the principles of collateral estoppel. The defendant concedes on appeal that his claims were not preserved at trial but nevertheless seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[2] We examine each claim pursuant to *Golding* in turn.

---

[2] *State* v. *Golding*, supra, 213 Conn. 239–40, provides that "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt."

The defendant also seeks review of his claims under the plain error doctrine. See Practice Book § 60-5. "[T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . We recently clarified the two step framework under which we review claims of plain error. First, we must determine whether the trial court in fact committed an error and, if it did, whether that error was indeed plain in the sense that it is patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . We made clear . . . that this inquiry entails a relatively high standard, under

The following additional facts are relevant to our resolution of these issues. The defendant had been charged with, inter alia, murder. Over the defendant's objection, the court granted the state's request for a jury instruction on the lesser included offense of manslaughter in the first degree with a firearm under the theories of principal and accessorial liability. The court so instructed the jury.

Following deliberations, the jury reached a verdict. After the roll of jurors was called, the foreperson answered "not guilty" as the court clerk read the following charges: murder, manslaughter in the first degree with a firearm, conspiracy to commit murder, possession of an assault weapon and conspiracy to possess an assault weapon. The court then accepted the verdict.

Thereafter, the foreperson stated that "[s]omething is wrong." The court sent the jury back to the deliberation room and informed counsel of the procedure that was to follow. The jury then returned to the courtroom, and the court asked the jury to articulate its concern in a note. The jury returned to the deliberation room and

which it is not enough for the defendant simply to demonstrate that his position is correct. Rather, the party seeking plain error review must demonstrate that the claimed impropriety was so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal. . . .

"In addition, although a clear and obvious mistake on the part of the trial court is a prerequisite for reversal under the plain error doctrine, such a finding is not, without more, sufficient to warrant the application of the doctrine. Because [a] party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice . . . under the second prong of the analysis we must determine whether the consequences of the error are so grievous as to be fundamentally unfair or manifestly unjust. . . . Only if both prongs of the analysis are satisfied can the appealing party obtain relief." (Citation omitted; internal quotation marks omitted.) *Crawford* v. *Commissioner of Correction*, 294 Conn. 165, 204–205, 982 A.2d 620 (2009).

The defendant cannot prevail under the plain error doctrine. There is no error, plain or otherwise; additionally, his claims are simply not of the truly extraordinary nature that the plain error doctrine is intended to remedy.

sent out a note that stated: "[W]e found [the defendant] guilty of 'accessory to manslaughter' and [want] guidance. We were waiting for 'accessory' to be read." The court described the contents of the note on the record. The court stated that, as evidenced by the note, it was the jury's position that it had not been asked to provide its verdict as to manslaughter in the first degree with a firearm as an accessory. The court indicated that it would have to vacate its finding that the verdict was accepted and recorded, at least as to the manslaughter charge. The court then stated that, unless the parties had an objection, the jury would be asked to return its verdict again as to all the charges, including the lesser included offense of manslaughter in the first degree with a firearm. In an effort to ameliorate any misunderstanding, the court planned to separate the manslaughter charge into two subsets: manslaughter as previously read and manslaughter as an accessory. There was no objection.

After the jury returned to the courtroom, the court clerk again called the jury roll and then asked for the jury's verdict as to each offense. This time, the court clerk inquired as to the offense of manslaughter in the first degree with a firearm twice: once as previously read and interpreted by the jury to encompass only liability as a principal and once as an accessory. The court clerk inquired: "To the lesser included offense in count one, what say you to the lesser included offense of manslaughter in the first degree with a firearm in violation of § 53a-55 (a) (3) of the Connecticut General Statutes," to which the foreperson responded: "Not guilty." The court clerk then inquired: "For the lesser included offense in count one, what say you to the lesser included offense of manslaughter in the first degree with a firearm as an accessory in violation of the same section of the Connecticut General Statutes," to which the foreperson responded: "Guilty." The jury

returned a verdict of not guilty to the remaining charges. The court then accepted the verdict. The defendant did not object.

## A

The defendant contends that the prohibition against double jeopardy was violated because the jury first found him not guilty of manslaughter in the first degree with a firearm and then, upon the second formulation of the verdict by the clerk, found him guilty of manslaughter in the first degree with a firearm as an accessory. Because the record is adequate and a double jeopardy claim is of constitutional magnitude; see *State* v. *Chicano*, 216 Conn. 699, 704–705, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991); we review the defendant's claim.

"The fifth amendment to the United States constitution provides in relevant part: No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . . The double jeopardy clause of the fifth amendment is made applicable to the states through the due process clause of the fourteenth amendment. . . . Although the Connecticut constitution has no specific double jeopardy provision, we have held that the due process guarantees of [our state constitution] include protection against double jeopardy. . . . [T]he Double Jeopardy Clause consists of several protections: It protects [inter alia] against a second prosecution for the same offense after acquittal." (Citation omitted; internal quotation marks omitted.) *State* v. *Bletsch*, 281 Conn. 5, 27, 912 A.2d 992 (2007).

"Double jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met. . . . While the first prong

requires a review of the bill of particulars, the second prong requires the application of the test set forth in *Blockburger* v. *United States,* 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932) . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Re,* 111 Conn. App. 466, 469, 959 A.2d 1044 (2008), cert. denied, 290 Conn. 908, 964 A.2d 543 (2009).

The defendant's claim fails because he was not convicted of the same offense of which he also was acquitted. In this case, the jury expressed confusion in its first effort to return a verdict on the charge of manslaughter in the first degree with a firearm. Ordinarily, of course, criminal liability as either a principal or an accessory is charged as one offense, and the jury is instructed that it should return a verdict of guilty if it finds the defendant guilty either as principal or as accessory. It is not even necessary for conviction that the jury agree on whether the defendant was a principal or an accessory. See *State* v. *Flanders,* 214 Conn. 493, 504–505, 572 A.2d 983, cert. denied, 498 U.S. 901, 111 S. Ct. 260, 112 L. Ed. 2d 217 (1990). The court, having already accepted the verdict prior to the foreperson's noting that "[s]omething is wrong," indicated that it would vacate that verdict at least as to the manslaughter charge. The jury's note clearly and unequivocally stated that it "found [the defendant] guilty of 'accessory to manslaughter' . . . ." The court then, without objection from counsel, separated the offense of manslaughter in the first degree with a firearm into principal[3] and accessorial liability for purposes of the jury's verdict. The jury's verdict, which was more specific than legally required, indicated that the defendant was found guilty

---

[3] The first of the separated inquires as to guilty regarding the offense of manslaughter did not expressly refer to liability as a principal. In context, however, it is clear from the jury's prior responses and note that the defendant in substance was found not guilty as a principal, rather than not guilty of the offense of manslaughter.

of the crime as an accessory and not as a principal. This parsing of the jury's verdict, in the unusual circumstances presented, does not amount to a violation of the defendant's right to be free from double jeopardy. Accordingly, the defendant's claim fails under the third prong of *Golding* because he has not proven that a constitutional violation clearly exists and clearly deprived him of a fair trial.[4]

## B

The defendant next claims that the verdict resulted in his being convicted of the nonexistent crime of being an "accessory." The defendant argues that because he was "unequivocally" acquitted of the crime of manslaughter in the first degree with a firearm, he could not also have been convicted of the crime of manslaughter in the first degree with a firearm as an accessory. The defendant asserts that because accessory and principal liability are alternative ways of committing the same substantive crime, he cannot be guilty of manslaughter in the first degree with a firearm as an accessory after first being acquitted of the substantive crime. Thus, in the defendant's view, when the jury found him guilty, it must have found him guilty of the "crime" of being an accessory only, unattached to any substantive crime. Because there is no such crime as being an accessory, the defendant argues, he was convicted of a crime that is not cognizable at law. We review the defendant's claim because the record is adequate for review and the defendant alleges a violation of a fundamental right; that is, that he was convicted of a nonexistent offense. *State* v. *Mooney*, 61 Conn. App. 713, 722–23, 767 A.2d 770, cert. denied, 256 Conn. 905, 772 A.2d 598 (2001).

[4] We note that any question may have been avoided in this case had the court, in its recharge, emphasized that one may be guilty of the offense of manslaughter in the first degree with a firearm either as a principal or as an accessory.

We agree with the defendant that "there is no practical significance in being labeled an 'accessory' or a 'principal' for the purpose of determining criminal responsibility" and that "[t]here is no such crime as being an accessory . . . . The accessory statute merely provides alternate means by which a substantive crime may be committed." (Citation omitted; internal quotation marks omitted.) *State* v. *Aponte*, 50 Conn. App. 114, 119, 718 A.2d 36 (1998), rev'd in part on other grounds, 249 Conn. 735, 738 A.2d 117 (1999). The fact that there is no practical significance in being labeled as an "accessory" or a "principal" for purposes of determining criminal responsibility does not mean, however, that the defendant was convicted of simply being an accessory, unattached to a substantive crime. Although the jury in its verdict in this case specified in form that it found him guilty of being an accessory and not a principal, the defendant in substance was convicted of the crime of manslaughter in the first degree with a firearm under a theory of accessorial liability. We conclude that this claim fails under the third prong of *Golding* because the defendant has not shown that a constitutional violation clearly exists and clearly deprived him of a fair trial.

C

The defendant next claims that his conviction is legally inconsistent because he was first found not guilty of manslaughter in the first degree with a firearm and then found guilty of manslaughter in the first degree with a firearm, when the jury returned its verdict a second time. In *State* v. *Arroyo*, 292 Conn. 558, 586, 973 A.2d 1254 (2009), our Supreme Court adopted the rule that claims of legal inconsistency between a conviction and an acquittal are not reviewable in accordance with *United States* v. *Powell*, 469 U.S. 57, 105 S. Ct. 471, 83 L. Ed. 2d 461 (1984). See also *State* v. *Ramirez*, 292

Conn. 586, 590–91, 973 A.2d 1251 (2009). Accordingly, this claim is not reviewable.

## D

The defendant next claims that his conviction violates the principles of collateral estoppel. We review the defendant's claim because the record is adequate for review and the defendant alleges a violation of a constitutional right. See *State* v. *Garner*, 270 Conn. 458, 482, 853 A.2d 478 (2004) (defendant's collateral estoppel claim failed under third prong of *Golding*); see also *State* v. *Knight*, 266 Conn. 658, 663, 835 A.2d 47 (2003) (collateral estoppel given constitutional dimensions by double jeopardy clause).

"The common-law doctrine of collateral estoppel, or issue preclusion, embodies a judicial policy in favor of judicial economy, the stability of former judgments and finality. . . . As a general rule, [a]pplication of the doctrine of collateral estoppel is neither statutorily nor constitutionally mandated. . . . In a criminal case, [however], collateral estoppel is a protection included in the fifth amendment guarantee against double jeopardy. . . . Collateral estoppel means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." (Citations omitted; internal quotation marks omitted.) *State* v. *Garner*, supra, 270 Conn. 482.

In this case, the principles of collateral estoppel do not apply. The defendant argues in his appellate brief that, although collateral estoppel has a strict requirement of a prior proceeding, the repeated taking of verdicts can be viewed as successive proceedings. There was, however, only one final judgment involved in this case, and there was no subsequent litigation involving the same ultimate facts. The principles of collateral

estoppel do not apply, and the defendant cannot prevail under the third prong of *Golding.*

## II

The defendant next claims that in its jury instructions, the court improperly suggested that defense counsel had made an improper closing argument, thereby improperly highlighting the defendant's decision not to testify. We disagree.

The following additional facts are relevant to our resolution of this issue. At trial, defense counsel elicited testimony from various witnesses that the SKS rifle used in the shooting was heavy and generally required two hands to load or fire. During closing argument, defense counsel stated that the jury heard Ramos testify that the defendant had an SKS rifle and that the jury heard testimony that such a rifle is "pretty heavy" and "has a kick." Defense counsel stated: "I would ask you, looking at [the defendant] right here, he's a buck nothing, little scrawny guy. Do you think he could handle a weapon such as—such as that? When you go back in the jury room, you handle that weapon."

Defense counsel then asked the defendant to stand up. As the defendant stood, defense counsel continued: "You handle that weapon and see if you could handle it and then see if you could handle it with one hand." The defendant then raised both of his hands. Defense counsel then argued: "One hand. You handle it with two and then you try to handle it with one. The state wants you to believe that [the defendant] was able to maneuver this weapon. [The defendant] couldn't maneuver this weapon. Ramos had the assault rifle, Ramos fired the assault rifle and Ramos killed the victim."

After counsel completed closing arguments and the court recessed, the prosecutor objected. He asserted

that although he had not observed the defendant display his left hand during defense counsel's closing argument, he had been alerted during the recess that this had occurred. The prosecutor noted that the defendant had kept his left hand covered with his shirt during trial. During defense counsel's closing argument he had exposed his left hand, apparently revealing that the hand's digits consisted of only a thumb and half of a little finger. The prosecutor requested that the court instruct the jury that the defendant's visual display of his hand was not evidence and that there was no evidence that the defendant was unable to fire a gun. Defense counsel argued that any such instruction would be inappropriate. The court decided that it would instruct the jury to disregard what had occurred even though "it highlights the issue and that is [a] catch-22 . . . ."

Prior to its instruction on defense counsel's improper argument, the court generally instructed the jury that proper evidence for its consideration included sworn testimony under oath subject to cross-examination and full exhibits, and that proper evidence did not include statements made by lawyers, including statements in their closing arguments. With respect to the visual display, the court instructed the jury as follows: "You are to consider only the evidence in this case. What is the evidence? Witness stand and exhibits; we discussed that. That's the evidence. It has been tested through cross-examination, and the court has received the exhibits as full with counsel having the ability to object or make their claims legally known for the record.

"Visual displays other than permitted by the court. In this courtroom, although you—you saw something, not evidence, not evidence, not evidence. It is not subject to cross-examination, it's not subject to anything at all in this courtroom in the orderly course of this

proceeding. And why so? Because of that we can determine . . . the integrity of any evidence only through the accepted procedures established . . . [a]nd whether or not the state proved beyond a reasonable doubt that [the defendant] fired the weapon or was a principal or accessory, you determine that based upon the facts, the facts in this case, and they came from the witness stand, whether you believe it or not. It's your job to determine whether you believe any or all of the evidence; that's your job. You can disbelieve any or none of anyone's testimony; that's your job. Not speculation. Not conjecture. Not guesswork. Not sympathy. But only on the facts, what was proven. And your decision is made, proof beyond a reasonable doubt, on the evidence or the lack thereof." Regarding the defendant's right not to testify, the court instructed the jury that the defendant elected not to testify and that "[h]e has a constitutional right not to testify, and you must draw no unfavorable inferences from the defendant's election not to testify." The defendant objected, outside of the presence of the jury, to the court's instruction regarding the defendant's "visual display."

"The standard of review for claims of instructional impropriety is well established. [I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error." (Internal quotation marks omitted.) *State* v. *Reynolds*, 118 Conn. App. 278, 307, 983 A.2d 874 (2009), cert. denied, 294 Conn. 933, 987 A.2d 1029 (2010).

"A trial court has wide discretion to determine the propriety of counsel's argument and may caution the jury to disregard improper remarks in order to contain prejudice. A reviewing court may only disturb the trial court's actions in instances of abuse of this wide discretion." *State* v. *Herring*, 210 Conn. 78, 102, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989).

"Our Supreme Court frequently has stressed the importance of restricting comments made during closing arguments to matters related to the evidence before the jury. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, *it must never be used as a license to state, or to comment upon, or even to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to consider.*" (Emphasis in original; internal quotation marks omitted.) *State* v. *Rios*, 74 Conn. App. 110, 119, 810 A.2d 812 (2002), cert. denied, 262 Conn. 945, 815 A.2d 677 (2003).

"[C]ounsel may comment [in closing argument] upon facts properly in evidence and upon reasonable inferences to be drawn from them. . . . Counsel may not, however, comment on or suggest [in closing argument] an inference from facts not in evidence." (Internal quotation marks omitted.) *State* v. *Sweeney*, 104 Conn. App. 582, 598, 935 A.2d 178 (2007). "Bodily conditions that are visible and readily apparent may be exhibited to the trier. . . . Unlike manipulation or demonstration of bodily functions, the display of static bodily conditions does not raise questions as to the sincerity and honesty of the witness. A person who is merely exhibiting static or objective bodily conditions need not be a competent witness or under oath *unless his or her testimony is necessary to make the exhibition relevant.*" (Citations omitted; emphasis added.) C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 11.10.2, pp. 665–66.

The condition of the defendant's hand was not a part of the evidence in the record and, therefore, was not a proper subject of the defendant's closing argument. See *State* v. *John B.*, 102 Conn. App. 453, 465, 925 A.2d 1235, cert. denied, 284 Conn. 906, 931 A.2d 267 (2007). The defendant did not testify and evidence relating to the condition of the defendant's hand had not been admitted as evidence, whether by demonstration, through documentary evidence or witness testimony. The only time that the hand was demonstrated was during the defendant's closing argument. Defense counsel's comments on the condition of the defendant's hand were not proper because they constituted argument on matters extrinsic to the evidence. See id. There was no evidence introduced at trial that at the time of the crime the defendant's hand was in a damaged condition, or that the damage prevented him from being able to shoot the rifle. "It would be pointless to conduct trials according to established rules of procedure and evidence and to charge juries to base their verdicts only on the evidence, or lack thereof, and then to permit closing arguments to contain unsworn testimony from lawyers to the jury about matters that were not in evidence and for which opposing counsel could not have offered evidence."[5] *State* v. *Giordano-Lanza*, 83 Conn. App. 811, 817, 851 A.2d 397, cert. granted on other grounds, 271 Conn. 911, 859 A.2d 572 (2004) (appeal dismissed as moot October 25, 2005).

In response to the defendant's display of his hand during defense counsel's closing argument and defense counsel's corresponding argument relating to this extrinsic evidence, the court properly instructed the

---

[5] A display of bodily condition may well have been appropriate during the evidence phase of the trial, at which time relevant testimony about the condition and any attendant disability may have been presented. We conclude, however, that, in the circumstances of this case, a display during the argument phase, with no opportunity for qualification, explanation or determination of functional disability, was inappropriate.

jury that it could consider only the evidence in this case, which evidence did not include visual displays not permitted by the court. Contrary to the defendant's argument, the court's instruction did not improperly highlight the defendant's decision not to testify at trial. Rather, in its instructions regarding the defendant's election not to testify, the court aptly told the jury that it could "draw no unfavorable inferences from the defendant's election . . . ." Accordingly, the defendant cannot prevail on this claim.

The judgment is affirmed.

In this opinion the other judges concurred.